We'll just wait to let everyone get settled so there's no hurry. Okay Mr. Leonard. Please support. This case involves a franchise agreement, a relationship between a franchisor and a franchisee. And to get right to it, the appeal really revolves around two primary issues. First should an implied covenant to maintain brand integrity be read into the franchise agreement. And second are the two preconditions to the guarantee signed by Mr. Ian Thomas applicable. In opposition to the summary judgment motion filed by Jani-King, Jani-King JB, the regional franchisor, submitted extensive and detailed summary judgment. I can go through and elaborate, but it's probably not necessary unless the Court has questions. But the gist of it was that Jani-King was running its domestic operations in the U.S. in a way that absolutely destroyed the brand integrity, destroyed the brand of Jani-King, and prevented my client from effectively marketing franchises for Jani-King in the United Kingdom. I go through the summary judgment extensively, summary judgment evidence that there's a lot of internet noise and the numbers are pretty dramatic. The franchise revenues dropped by about 80% over a five-year period of time. Largely as a result, we believe that the internet noise created by social media, and mentioned if you put in Jani-King, it could come up in Google, the scam, fraud. My client was trying to attract investors who really could capitalize and fund the franchise operations, and with that type of negative noise out there, you just couldn't do it. The regional franchise agreement itself was like you would expect a lot of these contracts, very similar to bank contracts, very one-sided. In fact, very few requirements at all upon the franchisor basically allow us to use their proprietary marks and the proprietary systems that they developed. It did not discuss what they had to do to maintain that. Now, I really don't think there's any question that the regional franchise agreement has implied covenants. In fact, it struck me when I was just reviewing again the brief by Jani-King, they pretty much admit to it. They describe an implied covenant on page 26 of their brief. They're talking about this argument, it's really a non-argument, about whether the contract is illusory, and to be clear about that, I'm not claiming the contract was illusory. What I stated was that without implied covenants, it could be argued that it's illusory. Now, I understand I'm not making that argument because we have our own counterclaim based on that contract, but I think probably the better argument would be understanding how high the hill is for illusoriness is that not all the material terms of the contract are described with certainty to make it enforceable unless you imply the contracts. On page 26, what Jani-King says is that the argument that's illusory ignores Jani-King's grant of the right to use and sub-license its commercial cleaning franchise system along with its proprietary marks and confidential information that's in the contract. But then it goes further and says, in Jani-King's promise to protect and maintain its proprietary marks, Jani-King's promise to protect and maintain its proprietary marks. Now, I'll leave it to counsel to correct me, but I reread the contract again this morning, very dry, 28 pages, a very small print. I didn't see that requirement in there. I agree that's a requirement. They, if they're going to license us the use of their proprietary marks, they have to protect and maintain it. I agree with that statement 100%, but that's an implied covenant, not an express provision of the contract. So I don't think the, I really don't think the issue of whether the contract, regional franchise agreement contract, has an implied covenant in it is up to serious consideration. I think the issue is what are the implied covenants? They've admitted to one, that they have to, they have a promise to protect and maintain the proprietary marks. The question is what else? What do you have to show under Texas law for a court to read in a covenant that's not in the contract? Yes, Your Honor. I have cited a number of cases. The Nexterra case is probably the most articulate one, also the Gaspard case. What's the standard? I don't need all the cases. Yes, sir. The implied covenants, there's two circumstances under the Nexterra case. One, where the term was so clearly within the contemplation of the parties that they deemed it unnecessary to express it. And two, on equitable grounds. Which of those, or both, are you relying on? I think both, because if you think about it, and this is what our summary judgment evidence showed, is we could not sell franchises because the way they've effectively destroyed the brand. If we're going to have to pay to use their brand, their proprietary marks, their proprietary business systems, then they can't turn around and do something like essentially run it, as I've alleged, as a similar to a Ponzi scheme, and destroy the brand where we can't market it. So it is, I think, that the requirement that they maintain brand integrity was clearly within the contemplation of parties as they deemed it unnecessary to express it. It's very much like protecting the proprietary marks, which the Janneking is conceded is there. Because you can't license a trademark to somebody and then let it expire, or don't protect it, let it get diluted. That is most likely that is intended so clearly within the contemplation of parties that it was unnecessary to express it. And the second one would be equitable grounds. Is it equitable to force my client to pay the franchise fees that amounted eventually over $2 million when they have taken actions themselves that are laid out extensively in the summary judgment evidence that made it very difficult so much that we had to change our model and stop selling franchises? I think it's absolutely inequitable and unfair to require that payment under those circumstances, which would be the second reason that courts find implied covenants. It's also been articulated that terms of a contractor implied when they're necessarily involved in the contractual relationship such that the parties have intended to include them but failed to because of inadvertence or because they were too obvious and need expression. I think that maintaining the integrity of the brand is so obvious you don't even need to express it. You can't charge someone a fee to use your system and then run the company that you came to sell the franchises. So I think both of those are there. We've also cited the covenant that's seen in contracts in Texas law that there's implied promise by one that will do nothing to prevent, hinder, or interfere or hinder someone else in their performance in the contract. If there are two parties in the contract, you can't prevent the other party performing. Obvious hypothetical, if you have a contract to paint a house, you can't deny someone access to the house so they can do their job. And I cited this Court's leasehold expense recovery case. In response to that, what they did was they cited the — they said, well, that case really just involves contractor-subcontractor relationships, which is not exactly right because the case looked at different circumstances and said, well, this is — at the very least, this is similar to a contractor relationship, and I think this one is, too. And the Court also cited a district court — a state district court — I'm sorry, state appellate court opinion that approved of the instruction given by the trial court that said whenever cooperation is necessary for performance of a contract, there is an implied condition that cooperation will be given. So here, we're trying to do our job so we can pay these fees, and we just can't do it. And they could certainly argue, well, it's for different reasons or so forth, but we certainly did cross our summary judgment hurdle on that, and I think that's a fact issue the jury would have to decide. But the district court basically said, no, we don't even get there because we're not reading — it wasn't — it refused to read implied covenants into the contract. So the second issue is the guarantee. Before you move on to that, doesn't Section 6.1 have that language? Franchisor agrees to use and continue to develop, use and control its proprietary marks? Well, that's almost like a statement of fact. It's almost written like a recital. And I think based upon that, you can imply a covenant. 6.1 says franchisor and its affiliates have developed and use and continue to develop, use and control in connection with its system's certain proprietary marks. It doesn't say we're going to — we promise to protect and maintain the brand. I think that language is implied. That language is written almost like in the present sense. At the time of the contractor, they say — that contract, they say they develop, use, and continue to develop, use, and control. That's — I think you can base that and find, well, what they really mean to say, that implies they're going to protect and maintain the brand. But that's not a — that's not an express term of the contract. And so that's my answer to that one, Your Honor. The guarantee itself, the language — and I think this is just a matter of contract construction — the language on page 3 of the guarantee says, as conditions to the enforcement of this personal guarantee, it is expressly agreed that — and then the first one says, the franchisor, Jana King, shall mitigate its losses arising from any termination of the regional franchise agreement by operating the Jana King service in the territory directly or reselling it. What they're really asking the court to do is rewrite that contract and say, well, no, what it really means is, as conditions to collecting termination — post-termination losses, termination losses. Well, that's not what it says. It says, as conditions to the enforcement of the guarantee. I thought it said losses arising from any termination. That was a condition for them enforcing the guarantee, was that they mitigate losses resulting from termination. Now, what they're basically saying is, well, since we're not collecting losses from termination, it doesn't matter. It doesn't apply to us. Well, I think that is something the parties really, they bargained for. That was unintentional language. And I think by analogy, we often hear mitigation in terms of a lease. If you think of a situation where we all know — we've seen it, there's a lease, someone gets out of the lease, or for whatever reason their business fails. Suppose the landlord has to mitigate the damages by reletting the property. But suppose that property increased dramatically in price so that they could less it out for a higher amount. Well, under that situation, that would not just mitigate termination losses, but that would mitigate all their losses. So what they did is when they wrote this, they said as a precondition to enforcement of the guarantee, not enforcement as to this segment of the guarantee, but enforcement to the guarantee, they shall mitigate losses. And we presented summary judgment evidence showing that we did what this provision requires us to do, which is essentially assign them the rights and cooperate with them. They chose only to cherry-pick, and they only took over nine franchisors and left out 80 percent of the business, which was the direct business, because they didn't want to incur the liability of running it. That's not what it says. It says they have to, in order to enforce the entire guarantee, they have to mitigate the losses arising from termination. They can't just opt out of that by saying, if we choose to assert those losses. If they did, that should have been in there. So, and the second condition was that basically it stated that we're not responsible for losses caused by an act of God or force majeure. Here, act of God is separately defined. Force majeure is defined as any act outside the control of Mr. Thomas or his company, which could not be avoided by exercise of due care. The way that they ran their business that destroyed our ability to sell and operate franchises in England was something out of our control and could not have been avoided by us. Now, they've cited some cases talking about force majeure in the context of economic situations that come up, and they recently submitted to court the opinion that was just decided about a month and a half ago, the Tech Olmos case, which pretty much said very similar to what the other cases they cited were. But I did think the Tech Olmos case was probably the most articulate, and that one involved an argument that an economic downturn was force majeure because it was not in control. And certainly it would fit within that definition, but the court noted that you have to read common law into the force majeure clause. He essentially called it a gap filler. And in common law, they had the additional requirement that the event could not have been foreseeable. And as long as humans have had economic activity, we've had economic cycles up and down, and so when you enter into a contract, particularly a long-term contract, you had to have known that there was a possibility that there could be an economic downturn. Well, that's not what we're arguing. We're not arguing economic downturn. We're claiming it was not a bad economy, but it was what Janneking did that destroyed our ability to sell franchises that was force majeure, not act to God, which is separately defined, but an act outside of our control that we could not have avoided. And you could also say it was not foreseeable when we entered into the contract that they would do such a thing. So under both of those preconditions, Mr. Thomas should not be responsible for the guarantor, the guarantee, and as far as the regional franchise agreement, the only way to read it to make sense and to be something that had to clearly be within the contemplation of the parties and would be equitable would be to apply the condition just like they've made that there's a condition for protecting proprietary and protecting maintaining proprietary marks, but they comply a condition that they not do, that they maintain their brand integrity. So we don't have the situation that we have, which was they ran their business in such a way, created all this internet noise. My client couldn't sell franchises in England because of it, and essentially he had to redo his business model to directly service the companies, the contracts, the cleaning contracts, incur significant capital expenditure so that he couldn't pay the 3% overriding fees that they were demanding on the entire business. Thank you, Mr. Leonard. Do you have time for rebuttal? Yes, Your Honor. May it please the Court. As the District Court noted in its opinion below, this franchise agreement is no different than the standard franchisor-franchisee agreement, where the bargain is that the franchisee gets to use the brand, the intellectual property, the trademarks, and the system of the franchisor in exchange for paying a fee. And this is the system that these parties had operated under for more than 20 years. The last eight years were under the franchise agreement that's at issue on this appeal. And what happened in October of 2011 is Janneking GB continued to use the Janneking system, continued to use the brand and the trademarks. It just stopped paying for it. And over the next three years, it took in over 44 million pounds of revenue, resulting in a royalty obligation of over $2 million that it didn't pay for. And now, to avoid the summary judgment at the District Court, what Janneking GB is trying to do is retrade the deal that it cut back in 2005. And so it's trying to do that by inventing contractual obligations that the parties did not bargain for, that are not in the agreement, and by then alleging that there are genuine issues of material fact as to whether or not Janneking complied with obligations that are found nowhere in the franchise agreement. And this Court, like the District Court below, should reject the notion that it's necessary to imply covenants into this franchise agreement to make it enforceable and affirm the summary judgment. Now, the District Court correctly refused to imply the covenants because the franchise agreement is sufficiently clear and specific and enforceable as written. And as this Court well knows, there are few rules of contract construction that are more sacrosanct, that are more fundamental, that courts do not rewrite the party's agreement. They don't add language to the agreement that doesn't exist. And in Fisher, the Supreme Court of Texas makes very, very clear that courts only imply covenants in a couple of circumstances. One, when it's absolutely necessary to create an enforceable contract. And two, to avoid a forfeiture. Well, here, neither of those circumstances apply. The agreement's material and essential terms, the grant of the license to operate the system is sufficiently specific. And there is no threat or risk of forfeiture. The franchise agreement, as reflected in the record, was terminated by Janneking G.B.'s own doing prior to any litigation. The material and essential- Do you mean when they quit paying the royalties? Excuse me? Do you mean when they quit paying the royalties? Yes, Your Honor. That was what caused the termination? Yes, but my point is that it was Janneking G.B.'s own doing, their decision to terminate the agreement. It wasn't Janneking. And so there is no reason to imply a covenant to avoid a forfeiture. You have a contract that is already terminated. Is there any recovery available that you're seeking that would be available under the guarantee as opposed to the agreement? Excuse me, Your Honor? Is there any recovery available that you're seeking that would be available under the guarantee but not under the agreement or vice versa? No, Your Honor. Does it matter? It does matter because, I mean, the summary judgment grounds were proper under both the agreement and the guarantee, and we have two defendants and- The guarantee makes Thomas individually liable. That's correct. That's correct. And that was- Not the same amount. Yeah, and that was an essential bargain. I'm happy to shift and address the guarantee. Well, I'll address that when I talk about the guarantee because I want to go back to that point, Judge Costa. So in Section 2 and in Section 3, what you have is the grant of the license to operate the system, to use the confidential information, and to sublicense that to run the Janneking system in the United Kingdom. And then in Section 5, you have, as you would expect, an obligation on Janneking GB to pay a fee based on the revenue that it generates. And those agreements about the grant of the license, what the franchisee is getting, and its obligations to pay for that license are sufficiently clear. And the parties lived under those obligations and performed under those obligations for eight years. And prior to that, there was a predecessor franchise agreement that they lived under and performed under for 13 years. And so what Janneking GB does is they've ignored these sufficient and clear obligations in the contract and have invented this notion that somehow the agreement doesn't sufficiently address Janneking's obligations with respect to its proprietary marks. And that's just not so. You know, they throw out a number of hypotheticals in the brief, and then we heard some in argument. But, you know, there's no obligation to renew the trademarks is one thing that's alleged. That's not true. Section 1.1 of the agreement and Section 6.8.1 contain a representation that Janneking is the owner of the mark. That is the very thing that it is licensing. So if it failed to renew its mark, which didn't happen, that's not alleged, okay, then the remedy would be there would be a claim by JKGB that Janneking is in breach of those obligations, that it is the owner of the marks. Similarly, you know, there's this second hypothetical that was posed in the briefing of, well, what happens in a scenario where there's a competing company that comes into the UK and it starts using the Janneking name and brand, and Janneking just does nothing? Well, Judge Costa, I think you referenced Section 6.1. It's not just an obligation to develop and use, but an obligation to control its marks. And so if that, you know, parade of horribles actually happened and it didn't, there's a remedy that's specifically in the agreement to deal with this. The Fisher case in the Texas, the Supreme Court of Texas in Fisher, in discussing how it disfavors implying covenants, it says it's particularly loath to do so in circumstances where there has been partial performance. And again, here, we had performance for eight years. And so the performance for eight years under the agreement further supports the District Court's decision not to imply a covenant. Lastly, under, on the franchise agreement, the District Court correctly refused to imply a duty of cooperation. And relying on this Court's opinion in leasehold, what JKGB says is that under Texas law, in every contract, no matter what kind or shape, that there is an implied covenant to, quote, prevent, to do nothing to prevent, interfere, or hinder the other party in its performance. Neither leasehold expense recovery nor any other case applying Texas law stands for that type of implied covenant in every contract. What the, what this Court did in leasehold expense recovery was imply a limited duty of cooperation, not a duty to do nothing to prevent, interfere, or hinder the other party in its performance. And it did so for good reason, because LER literally could not perform the services under that contract, which was to help mothers reduce its expenses under its leases without the ability to actually go out and talk to mother's landlords. And mothers refused to authorize LER to do that. And this Court affirmed the District Court opinion and said, wait a minute, performance is literally impossible by LER, so yes, we'll imply this duty of cooperation so that the that is a far cry from a vague, undefined, illusory notion to imply a covenant to maintain brand integrity. So, not only did the District Court correctly render summary judgment on the franchise agreement, it was also correct in rendering summary judgment on the personal guarantee. And in construing the personal guarantee and the party's rights and obligations under that Texas law permits that the surrounding facts and circumstances, as well as the language of the franchise agreement itself, are noteworthy. As the record reflects, in 2005, when the party sat down to negotiate the franchise agreement and guarantee, Mr. Thomas had been operating as a Janneking Regional Franchisee since 1991 or 92. And they sat down and they created a new franchise agreement that was going to last for a term of 24 years, okay? And so with a contract of that length, it raises the specter of significant and material potential lost profit damages in the event that the term goes unfulfilled. And so what Thomas bargained for in the guarantee and what he received in the guarantee was protection from termination-related damages and damages caused by a business failure outside of Janneking GB's control in event of force majeure. And so the guarantee, which is at page three, section one, line one, Judge Clement, as you noted, requires Janneking to mitigate its losses arising from any termination of the agreement. It does not extend to all losses under the agreement or any damages incurred under the agreement. And so since the guarantee specifically mentions only one category of losses, the court must assume that the parties intentionally decided to exclude others. Now, Thomas's assertion that mitigation serves as an absolute bar to any recovery under the guarantee is flawed. It's flawed because it ignores the entire common law concept of mitigation, which is to prevent a party from recovering damages that are capable from being mitigated. The royalties that Janneking sought were for fees that were incurred and due and owing during the course of the performance of the contract. Those damages are incapable of being mitigated. And so the mitigation principle presupposes that there are damages that a party is seeking that can be mitigated. It doesn't, mitigation doesn't defeat a cause of action. It doesn't preclude a plaintiff from any recovery. It just reduces the damages that can be recovered to the extent that they can be mitigated, either with reasonable, through the reasonable efforts of the non-breaching party or specifically set forth in the party's contract. The guarantee's second precondition, the force majeure clause, likewise does not excuse Thomas from his obligation under the guarantee. And the reason is, is because a downturn in franchise sales is something that was foreseeable regardless of the cause of the downturn in franchise sales. That was a foreseeable event at the time the guarantee was executed. And it's very- He's blaming your client. Excuse me? He's blaming your client for the downturn. Yes, he is, Your Honor. And he does. And regardless of why, okay, it is foreseeable in any business relationship for any number of reasons that there might be a drop in production or a decline in sales. And the force majeure clause that's at issue in this contract is very, very specific because they could have negotiated in, the parties could have negotiated in specific language to address that. But the force majeure clause just says a business failure caused by an event of force majeure. And this Court in Eastern Airlines held that exculpatory provisions, which are phrased merely in general terms, have long been construed as excusing only unforeseen events which make performance impractical. And so absent an express provision to the contrary, hey, you do something wrong that causes these franchise sales to go down, the courts presume that the promissor agreed to bear the risk of loss for events that were foreseeable. And this principle has been followed by the First Court of Appeals in Houston in the Valero v. Mitchell Energy case and also in the Tech Olmos v. ConocoPhillips case. And in both of those cases, the First Court held that an economic downturn in those cases, it was a drop in commodity prices, but that was something that was foreseeable. And in Tech Olmos, the First Court said that's foreseeable as a matter of law. And they affirmed the trial court's summary judgment because it's always foreseeable that the business environment can change. And if you're worried about something specific related to force majeure, the lesson from Tech Olmos and from Valero and its progeny is to specifically draft those provisions into the agreement. The parties did not do so here. And so regardless of the cause of the lack of demand of franchise sales, this is something that was foreseeable when the parties executed the franchise agreement. And so there is not a fact issue that's raised on the force majeure's applicability. Unless the Court has any further questions, I'll yield the rest of my time. All right. Thank you, Mr. Hyman. Mr. Leonard, you've saved time for a vote. I would like to address what I think may be the crux of this issue as far as in follow-up on Judge Costa's comment about 6.1 of the regional franchise agreement. In the brief, they clearly said that Jana King, Jana King clearly said that it had the promise to protect and maintain its proprietary mark. If I heard counsel right, he's basically saying that comes not from an implied covenant, but from section 6.1. And the language is that they have used, developed, used, and continue to develop, use, and control. Now, the other sections he mentioned just meant his comment of the owner of the mark. But this one, control, if I'm hearing him right, counsel is saying that that means that if someone's infringing on the contract, on the trademark, they have the obligation to file a trademark action to protect it. That's part of the control. I'd like to focus the attention on section 7.1 of the regional franchise agreement. 7.1 involves confidential information. We're not alleging that they've let their copyright or their trademark expire. We're not alleging that people are infringing on it. We're alleging that the way they have run their business system has destroyed the brand. 7.1 is about confidential information. It says, franchisor, Jana King, has developed and uses and continues to develop, use, and control. There's that word control again. In connection with its system, certain confidential information programs methods, and then they go on to describe it as pertaining to franchise promotion, marketing, operation, and management of a business. That goes to the heart of our problem here, is they ran their business by essentially, as I lay out in detail, charging the upfront fees, then underbidding contracts so people can't afford it. They drop out. They get to essentially give the cleaning contracts to another sucker who comes aboard, pays the high upfront fees. And their system, it wasn't a Ponzi scheme, but I said it's like a Ponzi scheme because they made their money on churning the contracts and charging high upfront fees. They didn't make much money. They made a lot more money for an unsuccessful franchisor than a successful one. And once the internet changed and people started using social media and so forth, that internet noise essentially destroyed the brand. If the word control means they have the obligation to file a copyright trademark infringement suit or copyright suit, then the word control, this one, means they can't operate their system, which is defined here, pertaining to franchising, promotion, marketing, operation, management, and system in a way that essentially destroys the name Janneking so that overseas, my client can't market it. So I think that goes to the heart of it. I would note that as far as the guarantee, Judge Clement hit on that issue. This, we're not alleging an economic downturn. We're alleging what they did enabled us or forced us where we couldn't sell franchises. That is not an economic downturn that is predictable. Business cycles are predictable. This wasn't something they directly caused, and that would be force majeure. Is Janneking still in business? I believe they are. Thank you. All right. Thank you, Mr. Leonard. The case is under submission.